IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CADG ERWIN FARMS, LLC, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-02896-M |
| | § | |
| AARON IPOUR, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion to Dismiss, filed by Defendants Aaron Ipour; Zach Ipour; MCI Secured Income Fund, LLC; MCI Preferred Equity Fund, LLC; MCI Preferred Income Fund II, LLC; MCI Preferred Income Fund IV, LLC; and Megatel Capital Investment, LLC. ECF No. 5. For the reasons stated below, the Court concludes that Plaintiffs have failed to state a claim for relief under the Racketeer Influenced and Corrupted Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. Defendants' Motion to Dismiss is **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

I.   **Factual Background**

Plaintiffs are property developers[1] who assert RICO claims against two brothers, Aaron and Zach Ipour, and five investment funds[2] arising out of six residential developments located in

---

[1] Specifically, CADG Erwin Farms, LLC, CTMGT Erwin Farms, LLC; CTMGT Frontier 80, LLC; MM Plano 54, LLC; MM Verandah, LLC and One Verandah, L.P.; MM Northlake Phase 2-3, LLC; and Wilbow-Windhaven Development Corporation.

[2] Specifically, MCI Secured Income Fund, LLC; MCI Preferred Equity Fund, LLC; MCI Preferred Income Fund II, LLC; MCI Preferred Income Fund IV, LLC; and Megatel Capital Investment, LLC ("MCI") (collectively, the "Fund Defendants").

1

and around the Dallas–Fort Worth metroplex.[3] *See* ECF No. 1 ("Compl."); ECF No. 13 ("Case Statement"). Specifically, Plaintiffs allege that Aaron and Zach Ipour operated a "heads I win, tails you lose" scheme through the "Megatel Enterprise," which consists of the seven Defendants, three related non-parties—Megatel Homes, LLC, Megatel Homes II, LLC, and Megatel Homes III, LLC (collectively, "Megatel")—and Megatel's affiliates and subsidiaries. Compl. ¶¶ 1–6, 25, 34; Case Statement ¶ 6(a).

Plaintiffs allege that the Megatel Enterprise operated a scheme to fraudulently enter agreements to purchase finished lots from Plaintiffs, and then "wait and see" if business conditions were favorable before deciding to fulfill the agreements and close on the lots. Compl. ¶¶ 1–6, 34. After the agreements terminated, the Complaint alleges that the Ipour brothers—through instrumentalities of the Enterprise—injured Plaintiffs by "tying up" the properties through campaigns of fraudulent legal filings and litigation, which prevented Plaintiffs from being able to sell to other buyers. *Id.* Plaintiffs contend that, by impeding Plaintiffs' ability to sell the properties, Defendants benefitted by including the properties on their asset sheets and obtaining investor funding, as well as damaging Plaintiffs' reputations in the residential development community, and extorting concessions. *Id.* ¶¶ 34–35.

For example, Plaintiffs claim that Defendants employed this scheme in conjunction with a November 29, 2012, agreement between Plaintiff CADG Erwin Farms, LLC and Megatel, as to which Megatel represented—at the direction of the Ipour brothers—that it would timely purchase 125 subdivided finished lots in the Erwin Farms development. *Id.* ¶ 38(1). Plaintiffs allege that these representations were false because, at the time they were made, Megatel and the Ipours had

---

[3] The developments consist of the Erwin Farms community in McKinney, Texas; the Windhaven Crossing development in Lewisville, Texas; the Creeks of Legacy residential development in Celina, Texas; the Verandah community in Royse City, Texas; the Prairie Commons residential community in Frisco, Texas; and the Northlake Estates development in Little Elm, Texas. *See, e.g.*, Compl. ¶ 38.

no intention of performing, but entered the agreement so that Megatel "could falsely claim an interest in the Erwin Farms development to project itself as one of the largest homebuilders, to tie up the property, to defraud investors, and to prevent CADG Erwin Farms from selling the property to a serious buyer." *Id.*

The Complaint then recounts a series of communications to CADG Erwin Farms sent via U.S. mail on behalf of Megatel and at the direction of the Ipour brothers, and actions intended to improperly tie up the property. Specifically, the Complaint describes: (1) a May 27, 2020, notice of default, asserting that an amenity center was not timely constructed, demanding the return of earnest money, damages, and threatening legal action; (2) a May 29, 2020, notice withdrawing the May 27 notice of default, but contending that CADG Erwin Farms was in default for failure to timely attain substantial completion; (3) a September 17, 2020, notice of termination of the November 29, 2012, agreement, on the grounds that CADG Erwin Farms did not reach timely substantial completion of lot development; and (4) an October 27, 2020, notice that Megatel was reversing the prior termination and was ready to purchase lots upon notice of substantial completion. *Id.* ¶ 38(1)–(6). The Complaint characterizes these communications as fraudulent and extortionate, intended, *inter alia*, to delay the time for Megatel's performance under the agreement and use economic fear and implicit threats to extort CADG Erwin Farms, including preventing sale of the property to another buyer. *Id.* ¶ 38(6).

After CADG Erwin Farms refused to sell Megatel additional lots in the development, Megatel sued CADG Erwin Farms, seeking a declaration that Megatel was entitled to purchase the disputed lots. *Id.* ¶ 38(7). The Complaint describes four "fraudulent liens," *i.e.*, notices of *lis pendens*, filed by Megatel subsequent to the lawsuit on the Erwin Farms property, which Plaintiffs allege was intended to cloud title to the property, obstruct efforts to sell to other

homebuilders, harm CADG Erwin Farms's business relationships, and gain leverage. *Id.* ¶ 38(8). Approximately 15 months passed from the time that Megatel terminated the Erwin Farms agreement and the time the last *lis pendens* was expunged. *Id.* ¶ 38(14). Plaintiffs allege that the sequence of letters, accusations, delay, terminations, reversed terminations, and notices of *lis pendens* individually and collectively constitute predicate acts of mail fraud, wire fraud, and extortion, amounting to false, fraudulent, and extortionate conduct. Plaintiffs claim these actions were intended to instill economic fear that discouraged and prevented Plaintiffs from operating freely, resulting in delay, costs, and tarnished relationships between Plaintiffs and lenders, local governments, and other homebuilders and buyers.

The Complaint recounts similar allegations for all six developments at issue, *i.e.*, Megatel entered into an agreement with Plaintiffs or Plaintiffs' predecessor in which it purportedly agreed to purchase—or, in the case of the Northlake Estates property, had the option to purchase—lots in a particular development, but in fact, Megatel and the Ipour brothers entered each agreement with no intention of performing.[4] After the passage of time and various communications between the parties—including alleged demands, notices of default, and opportunities to cure—each agreement was subsequently terminated, either by Plaintiffs or Megatel.[5] For each

---

[4] Specifically, in addition to the November 29, 2012, agreement between Megatel and Plaintiff CADG Erwin Farms, LLC relating to the Erwin Farms development, the Complaint describes: Megatel and Centurion Acquisitions, LP (the predecessor in interest to Plaintiff Wilbow-Windhaven Development Corporation) entered into an October 27, 2014, purchase and sale agreement to purchase 168 townhome lots in the Windhaven Crossing development (Compl. ¶ 38(15)); Megatel and Plaintiff CTMGT Frontier 80, LLC entered into a contract of sale in which Megatel agreed to purchase 137 lots in the Creeks of Legacy development (*id.* ¶ 38(22)); Megatel and Plaintiffs MM Verandah, LLC and One Verandah, L.P. entered into a May 5, 2017, "lot takedown contract" in which Megatel agreed to purchase 100 subdivided lots in the Verandah development (*id.* ¶ 38(30)); Megatel and Plaintiff MM Plano 54, LLC entered into a July 2015 contract in which Megatel agreed to purchase 182 lots in the Prairie Commons development (*id.* ¶ 38(36)); and Megatel and CADG Property Holdings III, LLC (the predecessor in interest to Plaintiff MM Northlake Phase 2-3, LLC) entered into an agreement in which Megatel had the option to purchase 115 subdivided lots in the Northlake Estates development (*id.* ¶ 38(48)). The Complaint does not specify the date of the alleged agreements between Megatel and Centurion Acquisitions, LP, and Megatel and CADG Property Holdings III, LLC.

[5] The allegations in the Complaint state that the agreements relating to the Windhaven Crossing, Creeks of Legacy, Prairie Commons, and Northlake Estates developments were terminated for various reasons by the respective Plaintiffs

4

development, Megatel subsequently initiated litigation and recorded notices of *lis pendens* for the disputed lots, thereby allegedly clouding title to the developments, preventing Plaintiffs from operating freely, and forcing them to incur costs until Plaintiffs were able to have the liens expunged or the lawsuits dismissed. *See id.* ¶ 38.

On December 23, 2022, Plaintiffs filed suit. The Complaint asserts four claims: one claim for violation of RICO under 18 U.S.C. § 1962(c) against Aaron and Zach Ipour; two claims of RICO conspiracy under 18 U.S.C. § 1962(d), the first against Aaron and Zach Ipour, and the second against all Defendants; and a claim for attorneys' fees. *Id.* ¶¶ 43–59. On August 3, 2023, at the Court's request, Plaintiffs filed a RICO Case Statement. *See* Case Statement, ECF No. 13.

## II.     Legal Standard

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Munck Wilson Mandala LLP v. Jordan*, No. 3:22-CV-01657-M, 2023 WL 5437771, at *3 (N.D. Tex. Aug. 22, 2023) (Lynn, J.) (citing *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Applying the "plausibility" standard from *Iqbal* and *Twombly*, the Fifth Circuit disregards legal conclusions, threadbare recitals of the elements of a cause of action, conclusory statements, and naked assertions devoid of further factual enhancement. *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). Indeed, the "[f]actual allegations must be enough to raise a right to relief

---

for each development. *See* Compl. ¶ 38(15), (23), (38), (50). The Complaint indicates that Megatel sent a notice of termination for the Erwin Farms and the Verandah developments. *Id.* ¶ 38(3)–(5), (31).

above the speculative level." *Twombly*, 550 U.S. at 555. "A sheer possibility that a defendant has acted unlawfully" is not sufficient to satisfy a plaintiff's pleading obligations. *Iqbal*, 556 U.S. at 678; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).

When alleging fraud or mistake, a complaint is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring a plaintiff to "state with particularity the circumstances constituting fraud." *Williams v. WMX Techs. Inc.*, 112 F.3d 175, 177 (5th Cir. 1997); Fed. R. Civ. P. 9(b). This requires "at a minimum" that a plaintiff provide the "'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Williams*, 112 F.3d at 179).

### III.   Analysis

Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff has not stated a claim upon which relief can be granted. The Court agrees, and concludes that Plaintiffs have not stated a claim for a violation of RICO under 18 U.S.C. § 1962(c), or RICO conspiracy under 18 U.S.C. § 1962(d).

To state a claim for a violation of RICO's substantive provisions under § 1962(c), Plaintiffs must plausibly allege Defendants[6] engaged in conduct of an enterprise through a pattern of racketeering activity. *Molina-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020). The statute defines "racketeering activity" to mean, among other things, any act indictable under specified federal statutes, including mail and wire fraud statutes.

---

[6] Plaintiffs allege a violation of § 1962(c) against the individual Ipour Defendants, and only assert a claim of RICO conspiracy under § 1962(d) against the remaining Defendants. However, to state a claim for RICO conspiracy, Plaintiffs must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the Defendant knew of and agreed to the overall objective of the RICO offense. *See United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005). Thus, even though Plaintiffs have only asserted a claim for substantive RICO violation against Aaron and Zach Ipour, the Court will consider whether Plaintiffs have plausibly stated a claim for a substantive RICO violation as to all Defendants.

*See* 18 U.S.C. § 1961(1). "The acts comprising racketeering activity are commonly known as predicate acts." *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 511 (5th Cir. 1990).

Plaintiffs bring civil RICO claims based on predicate acts of mail fraud, wire fraud, and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Mail and wire fraud claims require: (1) a scheme to defraud; (2) the use of mails or, if by wire, the interstate use of the wires to execute the scheme; (3) the use of mails or wires being incident to the essential execution of the scheme; and (4) actual injury to the plaintiff. *United States v. Humphrey*, 104 F.3d 65, 70 n.3 (5th Cir. 1997); *Landry v. Air Line Pilots Ass'n*, 901 F.2d 404, 428 (5th Cir. 1990). Rule 9(b) requires particularity in pleading the circumstances constituting fraud; this requirement applies to the pleading of fraud as a predicate act in a RICO claim. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992). The Hobbs Act imposes criminal liability on anyone who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion." 18 U.S.C. § 1951(a). The term "extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). An effect on interstate commerce is a required element of extortion. *United States v. Tomblin*, 46 F.3d 1369, 1382 (5th Cir. 1995).

Plaintiffs allege that Defendants engaged in a pattern of racketeering activity of mail and wire fraud, in which the Ipour brothers sent and caused Megatel to send "letters, notices, and other written correspondence by mail" and "email and cellphone communications" to, *inter alia*, induce Plaintiffs to enter contracts and forgo contractual rights, to make demands for money and concessions, to terminate and un-terminate contracts, to file fraudulent lawsuits and *lis pendens*, and to induce Plaintiffs not to sell finished lots to persons other than Megatel. Compl. ¶¶ 27–28,

7

32. Plaintiffs further allege that Defendants engaged in extortion and attempted extortion by the wrongful use of actual or threatened fear of economic harm should lots in certain developments not be sold on Defendants' terms, including through the use of mailed letters, litigation, and allegedly fraudulent liens in the form of notices of *lis pendens*. *Id.* ¶¶ 37–38, 45, 48; Case Statement ¶ 5(a), (c).

### A.    Plaintiffs have not plausibly stated a claim of a substantive RICO violation.

The Court concludes that Plaintiffs have not plausibly stated that Defendants engaged in unlawful racketeering activity under RICO. As an initial matter, the Complaint is wholly bereft of specific allegations regarding the Fund Defendants' participation or role in the alleged scheme. Paragraph 38 of the Complaint recites a non-exhaustive list of predicate acts purportedly made in furtherance of the Megatel Enterprise's scheme to defraud and injure Plaintiffs, but contains no reference to or any specific act or representation made by the Fund Defendants. For example, there are no allegations that the Fund Defendants sent or were involved in sending any misrepresentations via mail or email, or were involved in any extortionate acts intended to induce economic fear in Plaintiffs. *See generally* Compl. ¶ 38.

Instead, the only reference to the Fund Defendants' alleged participation in the scheme is an observation that "by tying up the lots, MCI could use them to misrepresent to investors the condition of Megatel projects," and a description of various funding offerings commenced by the Fund Defendants. Compl. ¶ 35. However, the Complaint does not connect the specific development projects associated with Plaintiffs with offerings commenced by the Fund Defendants, or even affirmatively allege that Defendant MCI *did*—as opposed to merely "could"—include Plaintiffs' developments on any prospective investor documents, so as to plausibly allege that each of the Fund Defendants contributed to the scheme. *See, e.g.*, *D'Arcy Petroleum, LLC v. Buster*, No. 3:19-CV-02770-M, 2020 WL 13157811, at *4 (N.D. Tex. Aug.

17, 2020) ("Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." (internal quotation marks omitted)).  Moreover, to the extent that Plaintiffs seek to hold the Fund Defendants liable based on any alleged misrepresentations to investors, Plaintiffs do not allege that they themselves invested or were potential investors in the relevant funds, and thus lack standing to assert such claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  As such, other than allegedly being controlled by the Ipour brothers, there is no basis in the Complaint to connect the Fund Defendants with the alleged criminal scheme, and thus no plausible claim connecting the Fund Defendants with the alleged substantive RICO violation.

As to the remaining Defendants, Aaron and Zach Ipour, the Court concludes that there are multiple fatal problems with Plaintiffs' substantive RICO claim as pleaded, warranting dismissal.  First, Plaintiffs' allegations of wrongdoing arise either from Megatel's contractual agreements to purchase property or litigation activity, which are not covered by RICO.

RICO was drafted "broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248–49 (1989).  However, the Fifth Circuit has observed that "[w]e must be wary of transforming business-contract or fraud disputes into federal RICO claims." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 836 (5th Cir. 2021); *see also Zastrow v. Houston Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015) ("The district court properly granted summary judgment on Zastrow's breach of contract claim dressed in civil RICO garb."); *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999) ("[I]f garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth,

9

would swallow state civil and criminal law whole."); *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1317–18 (11th Cir. 1998) (undue delay in paying invoices, even if for an extortionate purpose, does not support a RICO claim where the delay constitutes a breach of contract regarding timeliness of payment).

Admittedly, courts have recognized that breaches of contract, in some circumstances, may be a component of a scheme to defraud under RICO. *See, e.g.*, *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) ("Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO. Difficult is not impossible. Sometimes the evidence shows outright lies and a plan not to keep one's promises—enough of them to meet RICO's continuity-plus-relationship formula for a 'pattern.'" (citations omitted)). Such schemes require more than a defendant's failure to deliver or keep one's promise, such as proof that the promisor never intended to honor the contract, or affirmative misrepresentations or deceptive conduct. *See, e.g.*, *Conkling v. Turner*, 18 F.3d 1285, 1297 (5th Cir. 1994) (RICO claim dismissed after jury found no fraud in the execution of a stock redemption agreement).

Similarly, "litigation activity cannot be the predicate for a civil-RICO claim." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524 (5th Cir. 2016); *see also Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) ("[A]llegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087–88 (11th Cir. 2004) ("alleged conspiracy to extort money through the filing of malicious lawsuits" are not predicate acts of extortion or mail fraud under RICO); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003). Such litigation activity includes threats of litigation. *E.g.*, *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984)

("We cannot agree that the threat [of litigation] alleged here constituted the infliction of 'fear' for purposes of the extortion statute. . . . Such conduct may be tortious under state law, but we decline to expand the federal extortion statute to make it a crime.").

The predicate acts alleged by Plaintiffs arise out of a business contract dispute—*i.e.*, mailing notices of default or termination under the various agreements to purchase lots—or litigation activity in the form of filing lawsuits and notices of *lis pendens*. *See* Compl. ¶ 38; Case Statement at 19–41. In the absence of additional allegations of corruption or actual criminal activity, such claims are insufficient predicate acts under RICO. *See Snow Ingredients*, 833 F.3d at 525; *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."); *see also United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) ("A breach of contract does not amount to mail fraud."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("Nor does a breach of contract in itself constitute a scheme to defraud.").

Declaring default or termination under a contract, and filing related lawsuits and notices of *lis pendens*, is not inherently "wrongful," as such acts can be legitimate avenues of redress that Defendants may be entitled to pursue for alleged contractual wrongs; to the extent Plaintiffs contend that Defendants wrongfully declared default, improperly terminated an agreement, and filed baseless lawsuits, the law provides remedies in contract and tort law, not criminal law. Indeed, but for Plaintiffs' general and conclusory allegations regarding Defendants' intent not to perform Plaintiffs' claims amount to nothing more than run-of-the-mill contract disputes that ended up in litigation, and not a cognizable racketeering claim. For instance, Plaintiffs do not allege that Defendants made affirmative misstatements—such as falsifying documents—or

concealed information in exercising their contractual rights or engaging in litigation activities. *See, e.g.*, *Conkling*, 18 F.3d at 1297.

At best, Plaintiffs allege that Defendants entered into purchase agreements that they subsequently chose to breach, resulting in litigation. *E.g.*, Compl. ¶ 4 ("[The Ipour brothers] still wanted the ability or option to close—or not close, depending on unforeseen future market conditions, the availability of funding or financing, success of the project, and consumer demand . . . ."); Case Statement at 43 (explaining that Megatel would "enter Purchase and Sale Agreements with no intention of completing them, unless market conditions happened to be to their liking at the time"). Even if the Complaint satisfied Rule 9(b)—which it does not[7]—the Complaint has no allegations capable of transforming Plaintiffs' claim for breach into criminal fraud encompassed by RICO. *Kevin M. Ehringer Enterprises, Inc. v. McData Svcs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) ("[M]ere failure to perform contractual obligations as promised does not constitute fraud but is instead a breach of contract."). The crux of Plaintiffs' Complaint is that, at the time the agreements were entered into, Defendants did not disclose their intent to perform only if market conditions were right; however, "nondisclosure of an intent not to perform a contract generally cannot be used to bootstrap a fraud claim, since the mail and wire fraud statutes only proscribe representations designed to defraud." *Munck Wilson*, 2023 WL 5437771, at *8 (quoting *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1277 (S.D. Fla. 2003)

---

[7] For claims alleging fraud, scienter allegations must meet the heightened pleading requirements of Rule 9(b). *See Marriott Bros. v. Gage*, 704 F. Supp. 731, 740 (N.D. Tex. 1988), *aff'd* 911 F.2d 1105 (5th Cir. 1990). For each of the developments, Plaintiffs allege that the Ipour brothers made misrepresentations when entering agreements to purchase lots, because "at the time they were made, Megatel and the Ipour Brothers had no intention of performing within the timeframes set forth therein, or alternatively, knew they were incapable of doing so." *E.g.*, Compl. ¶ 38(1). Such conclusory allegations do not support an inference of fraudulent intent, because there are no specific facts provided from which one could infer that, *when the agreements were entered into*, the Ipour brothers had no intention of making the purchases. For example, the Erwin Farms agreement was entered into in 2012; there are no allegations in the Complaint plausibly establishing that, in 2012, Aaron or Zach Ipour had intent not to purchase the lots Megatel agreed to purchase. In sum, Plaintiffs do not provide any non-conclusory allegations that support an inference of fraudulent intent as to any of the allegations of fraud in the Complaint, including Plaintiffs' allegations of mail and wire fraud.

(citing *McNally v. United States*, 483 U.S. 350, 357 (1987), *abrogated by statute on other grounds, as recognized in Percoco v. United States*, 143 S. Ct. 1130, 1136 (2023))). Demonstrating by one example the deficiencies in Plaintiffs' pleadings, Plaintiffs' allegations are clearly insufficient to state a claim as to the Northlake Estates development, in which Megatel entered into a purchase *option* agreement; given that Plaintiffs' own allegations concede that Defendants had the contractual right not to purchase the property in question, Plaintiffs have not plausibly alleged that Defendants' subsequently failure to do just that constitutes fraud.

Even assuming that RICO encompasses the contract and litigation activity alleged here—and, as stated, the Court concludes that it does not—the alleged instances of mail fraud, wire fraud, and extortion are insufficient to state a claim under RICO. As an initial matter, the Complaint does not identify a specific single instance of *interstate* use of wires, and instead simply refers to communications made "by email," which the Court concludes is insufficient to satisfy the interstate element. *See* Compl. ¶ 38(4); Case Statement at 19–41; *Murphy v. Grisaffi*, No. CIV.A. 304CV0134B, 2005 WL 598015, at *3 (N.D. Tex. Mar. 14, 2005). Moreover, the predicate acts recount communications by Defendants and/or their agents which are all consistent with a legitimate, non-criminal business dispute, such as providing notice of default, making a demand under a contract, and providing notice of termination. Plaintiffs concede as much, admitting in the RICO Case Statement that "the mails and/or wires were used in furtherance of a larger scheme to defraud, as opposed to alleging that the communications themselves contained false or misleading information." Case Statement at 19. But as explained, the Complaint does not allege "a larger scheme to defraud" that is encompassed by RICO.

So too with Plaintiffs' allegations of extortion, based on the lawsuits and notices of *lis pendens* filed by Defendants. However, the Fifth Circuit has expressly held that, in the absence

13

of other criminal acts, such litigation activity, even if in bad faith, cannot serve as the basis for a civil RICO claim. *Snow Ingredients*, 833 F.3d at 525. The Complaint contains no allegations of any criminal activity in connection with the lawsuits and *lis pendens*, such as witness tampering or other corruption, which could trigger RICO's applicability. Moreover, as with wire fraud, Plaintiffs' allegations of extortion do not establish an effect on interstate commerce, which is required for a claim of extortion. *United States v. Tomblin*, 46 F.3d 1369, 1382 (5th Cir. 1995). Plaintiffs' allegations of extortion do not sufficiently plead racketeering activity.

For the foregoing reasons, the Court concludes that Plaintiffs have not plausibly alleged that Defendants engaged in racketeering activity in the form of mail and wire fraud or extortion. "Because [Plaintiffs] have not alleged the requisite predicate *criminal* acts under RICO, they have not met the pleading standard of Rule 12(b)(6)." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009). Moreover, given that Plaintiffs have already had ample opportunity to supplement their pleadings in the form of the RICO Case Statement, the Court finds that repleading in this instance would be futile. The Court has concluded that the crux of Plaintiff's allegations do not trigger liability under RICO, and thus repleading to provide additional specificity would not overcome the fundamental deficiencies of Plaintiff's RICO claim. Accordingly, leave to amend will not be granted.

### B. Conspiracy

Defendants move to dismiss Plaintiffs' claim for violation of 18 U.S.C. § 1962(d). That subsection "prohibits a conspiracy to violate §§ 1962(a), (b), or (c)." *D'Arcy Petroleum, LLC v. Buster*, No. 3:19-CV-02770-M, 2020 WL 13157811, at *8 (N.D. Tex. Aug. 17, 2020) (Lynn, C.J.) (citation omitted). The Court has already determined that Plaintiffs have failed to state a claim for a substantive RICO offense under 18 U.S.C. § 1962(c). Accordingly, Plaintiffs have

likewise failed to state a claim for RICO conspiracy. *See United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (to prove a RICO conspiracy, the Plaintiff must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense).

If Plaintiffs had a viable claim under § 1962(c), the conspiracy claims would still fail. In *Beck v. Prupis*, the Supreme Court stated that a RICO conspiracy claim requires that the overt act that caused the injury be an act of racketeering or otherwise unlawful under the statute. 529 U.S. 494, 505–06 (2000). Here, Plaintiffs characterize their financial injuries as being caused by the delay suffered as a result of the pending notices of *lis pendens*. ECF No. 13 at 61. Because the overt acts that caused Plaintiffs' injuries were not acts of racketeering or otherwise unlawful, dismissal of Plaintiffs' conspiracy claims is justified on this ground as well.

### IV.   Conclusion

Defendants' Motion to Dismiss is **GRANTED**. ECF No. 5. Because Plaintiffs have already explained their case in detail through their RICO Case Statement, the case is **DISMISSED WITH PREJUDICE** with all Court costs taxed against the Plaintiffs.

**SO ORDERED**.

March 31, 2024.

*[signature]*
BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE